**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION
CIVIL CASE NO. 1:21-cv-00262-MR-WCM**

| | |
|---|---|
| **TROY DAVENPORT,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | **MEMORANDUM OF** |
| ) | **DECISION AND ORDER** |
| **THE MANUAL WOODWORKERS** ) | |
| **AND WEAVERS, INC.,** ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

**THIS MATTER** is before the Court on the Defendant's Motion for Summary Judgment. [Doc. 17].

## I.    PROCEDURAL BACKGROUND

On October 1, 2021, the Plaintiff Troy Davenport ("Davenport") filed this action against The Manual Woodworkers and Weavers, Inc. ("MWW"), alleging that he was subject to a hostile work environment and retaliation for complaining about the hostile work environment in violation of 42 U.S.C. § 1981 and asserting a claim for infliction of emotional distress. [Doc. 1]. MWW filed its Answer on December 17, 2021 [Doc. 4], and the parties engaged in discovery. On October 13, 2022, MWW filed a Motion for Summary Judgment. [Doc. 17]. On November 9, 2022, Davenport filed a Memorandum

in Opposition to MWW's Motion for Summary Judgment [Doc. 21], and on the same day filed an Amended Memorandum in Opposition [Doc. 22]. MWW filed a Reply to Davenport's Amended Memorandum in Opposition on November 21, 2022. [Doc. 24]. Thus, the matter has been fully briefed and is now ripe for review.

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, answers, admissions, stipulations, affidavits, and other materials on the record show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)&(c). "As the Supreme Court has observed, 'this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 519 (4th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986)).

"Facts are material when they might affect the outcome of the case, and a genuine issue exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." Ballengee v. CBS Broad., Inc., 968 F.3d 344, 349 (4th Cir. 2020) (quoting News & Observer Publ'g Co. v.

Raleigh-Durham Airport Auth., 597 F.3d 570, 576 (4th Cir. 2010)). The Court does not make credibility determinations or weigh the evidence when ruling a motion for summary judgment. Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016). "Regardless of whether he may ultimately be responsible for proof and persuasion, the party seeking summary judgment bears an initial burden of demonstrating the absence of a genuine issue of material fact." Bouchat, 346 F.3d at 522. If this showing is made, the burden then shifts to the nonmoving party who must convince the Court that a triable issue does exist. Id.

In considering the facts on a motion for summary judgment, the Court will view the pleadings and material presented in the light most favorable to the nonmoving party and must draw all reasonable inferences in the nonmoving party's favor. Smith v. Collins, 964 F.3d 266, 274 (4th Cir. 2020).

## III.    FACTUAL BACKGROUND[1]

In October 2018, a temporary staffing agency assigned Davenport to MWW as a temporary employee.[2] [Doc. 17-2: Sargent Decl. at ¶ 11]. MWW

---

[1] This factual recitation is presented for the purposes of the MWW's Motion for Summary Judgment. Accordingly, the facts are presented in the light most favorable to Davenport. Adams. v. Trustees of the Univ. of N.C.-Wilmington, 640 F.3d 550, 556 (4th Cir. 2011).

[2] This was not the first time Davenport had been assigned to MWW by a temporary staffing agency. Davenport had also been assigned to MWW in 2015 but was terminated after getting into a physical altercation with another employee. [Doc. 17-2: Sargent Decl. at ¶ 9]. Although Davenport had been designated as "not eligible for rehire" after this

performs sublimate printing, a process in which an image on paper is transferred onto a textile. [Id. at ¶ 3]. MWW's standard practice is to employ temporary workers from October through December to assist with increased orders during the holiday season. [Id. at ¶ 5]. Davenport was one of those workers and worked as a print operator on the night shift. [Id. at ¶ 13].

On the morning of November 9, 2018, Davenport, who is African American, was subjected to the use of a racial epithet. [Id. at ¶ 20]. Four other night shift employees—Juan Pablo Martinez ("Martinez"), Juan Gonzalez ("Gonzalez"), Ricardo Nino ("Nino"), and Allen Broyles ("Broyles"), a print room team lead—were engaged in conversation during the shift. [Id. at ¶ 14, Doc. 17-5: Davenport Dep. at 68]. Martinez called out to Davenport, saying "what's up my n*****" ("the Martinez Incident"). [Doc. 17-5: Davenport Dep. at 68]. Davenport confronted Martinez about the use of the epithet, expressing that he felt disrespected and that the use of the word was deeply inappropriate. [Id. at 69]. Martinez apologized after being confronted. [Id. at 71].

Later that morning, Jose Andrade ("Andrade"), a print room supervisor, arrived at work and was informed about the Martinez Incident by Gonzalez.

---

incident, the staffing agency was apparently not aware of this designation when they made the 2018 assignment to MWW. [Id. at ¶¶ 10-11].

[Doc. 17-3: Andrade Decl. at ¶ 10]. Andrade spoke with Davenport and the other individuals involved and informed them that the incident would be investigated and that those involved would be disciplined. [Id.].

Andrade brought the Martinez Incident to the attention of Scott Sargent ("Sargent"), the Director of Manufacturing, who conducted an investigation. [Doc. 17-2: Sargent Decl. at ¶ 30]. As part of the investigation, Sargent and Andrade met with Davenport on November 14, 2018, apologized for the incident, and informed him that all four individuals involved would be disciplined in accordance with MWW policy. [Id. at ¶ 36]. Sargent also asked whether Davenport would like to change shifts and informed him that if he elected to remain on the same shift then Martinez's shift would be changed. [Id.]. During that meeting, Davenport expressed that he would like a "guaranteed job" beyond holiday season temporary employment. [Id.]. Sargent informed Davenport that while his temporary holiday employment was not in jeopardy, MWW did not "guarantee" jobs to temporary employees. [Id.]. Davenport expressed a desire to speak with human resources, and Sargent set up a meeting between Davenport and Angela Spencer ("Spencer"), MWW's human resources manager. [Id.].

As a result of the investigation, Martinez, Gonzalez, and Nino were issued "Final Written Warnings," Broyles was issued a "Written Warning,"

and all four individuals were informed that any additional instance of similar conduct would result in their immediate termination. [Id. at ¶ 38]. Andrade informed Martinez that he had been moved to the day shift, and Martinez subsequently resigned. [Id. at ¶¶ 39-41].

Davenport met with Spencer and Sargent on November 16, 2018, to discuss the actions that MWW took to respond to the Martinez Incident. [Id. at ¶ 42]. Davenport confirmed his decision to remain on the night shift and said that he did not want any of the individuals involved to lose their jobs. [Id.; Doc. 17-5: Davenport Dep. at 89]. Davenport also reiterated his desire for guaranteed permanent employment but was again informed that, while MWW did not guarantee permanent employment, his temporary employment was not in jeopardy. [Doc. 17-5: Davenport Dep. at 92].

Through the rest of November and early December, Davenport was absent from work on three occasions with no prior notification. [Doc. 17-2: Sargent Decl. at 62]. Davenport also was reassigned from one machine, the "Reggiani" printer, to another, the "Pantheras" printer.[3] [Doc. 17-3: Andrade Decl. at ¶ 8]. Even after this reassignment, Andrade observed that MWW records show mistakes made on the Pantheras printer as a result of multiple

_____

[3] MWW's stated reason for this reassignment was that Davenport was making too many errors on the Reggiani printer. [Doc. 17-3: Andrade Decl. at ¶ 8].

6

print batches being cancelled and restarted for the same product. [Id. at ¶ 28]. While Davenport does not dispute that he made some mistakes, he speculates that other employees were entering data on his machine while he was on break so that the mistakes appeared to be his own, resulting in more mistakes on his machine than those made by the average employee. [Doc. 17-5: Davenport Dep. at 109-12].

On December 3, 2018, Andrade held a meeting with the night shift printer operators to discuss recurring mistakes. [Doc. 17-3: Andrade Decl. at ¶ 30]. Davenport felt that during that meeting, Andrade and other supervisors were looking at him. [Doc. 17-5: Davenport Dep. at 114]. Davenport put his hand up while Andrade was speaking and accused Andrade of singling him out and directing comments toward him. [Id. at 114-15]. Davenport also called several of his coworkers racists during the meeting; however, it is not clear what led him to make such statements. [Id. at 115-16].

Later during the December 3-4 shift, a conflict arose between Davenport and two of the on-duty team leads, Liz Walker ("Walker") and Tracy Dotson ("Dotson"), due to Davenport's use of a chair in the print room. [Doc. 17-4: Dotson Decl. at ¶ 15]. Davenport previously received approval from Broyles to use a chair because of Davenport's back problems. [Doc. 17-5: Davenport Dep. at 117-18]. However, Walker and Dotson removed the

7

chair during the shift and told him he did not have permission from a lead. [Doc. 17-4: Dotson Decl. at ¶ 15]. After the chair was removed, Walker came by to check on Davenport during the shift, and Davenport told her he was "just here dealing with this bull shit, this buddy ship, conspiracy place." [Doc. 17-5: Davenport Dep. at 121-22].

While Walker and Dotson were engaged in a conversation during the shift, Davenport, who thought they were talking about him, interrupted their conversation and confronted the pair. [Id. at 119-20]. Walker then called Andrade, who had gone home for the night, to report that Davenport was being disruptive on the shift. [Doc. 17-3: Andrade Decl. at ¶ 34]. Andrade instructed Walker to call Sargent, and Sargent went to MWW to speak with Davenport. [Doc. 17-2: Sargent Decl. at ¶ 59].

Sargent met with Davenport and Walker to discuss the incidents during the shift. [Id. at ¶ 61]. Sargent raised his voice when he began to discuss Walker's allegations about Davenport's behavior. [Doc. 17-5: Davenport Dep. at 130]]. In response, Davenport "possibly" raised his voice as well. [Id.]. When Sargent brought up concerns that others had reported about Davenport, Davenport demanded that Sargent bring those individuals into the meeting. [Id. at 129-30]. Sargent declined to do so and told Davenport that while he investigated the reported issues Davenport would not be

8

allowed back into the print room. [Doc. 17-2: Sargent Decl. at ¶ 61]. Sargent instructed Davenport to go home for the day. [Id. at ¶ 62]. Davenport did not leave immediately, citing the need to get keys from a coworker who drove him to work. [Doc. 17-5: Davenport Dep. at 130]. Sargent told Davenport that, if he did not leave, he would have to call the Sheriff's department. [Doc. 17-2: Sargent Decl. at ¶ 62]. Davenport eventually went to the break room to get his things and then into the print room to speak to the coworker about getting the keys. [Id.]. While in the print room, Davenport spoke to Broyles and said that he "thought me and you were cool" but that Broyles "flipped on [him]" and that was "f'd up." [Doc. 17-5: Davenport Dep. at 130-31]. Davenport was escorted out of the building and left for the day. [Doc. 17-2: Sargent Decl. at ¶ 63]. Sargent testified that he investigated Davenport's December 3-4 shift behavior as well as Davenport's November-December performance and concluded that Davenport should be terminated. [Id. at ¶¶ 63-68]. Davenport's termination was effective on December 6, 2018. [Id. at 65]. His payroll change form identifies "poor performance" as the reason for termination. [Id.].

## IV.    DISCUSSION

MWW seeks summary judgment on Davenport's claims for a hostile work environment, retaliation for complaining about a hostile environment, and negligent and/or intentional infliction of emotional distress.[4] [Doc. 17].

### A.    Hostile Work Environment

Davenport's Complaint alleges that he was subject to a hostile work environment in violation of 42 U.S.C. § 1981.[5] [Doc. 1]. Section 1981 provides that:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes,

---

[4] MWW's Motion for Summary Judgment also seeks summary judgment on a disparate treatment claim. [Doc. 17-1 at 18]. However, Davenport's Complaint did not assert a claim for disparate treatment and his Memorandum in Opposition to the Motion for Summary Judgment does not mention such a claim. As such, that issue is not before the Court and the Court will not address the Defendant's argument on this issue further.

[5] Davenport does not assert a separate cause of action for a hostile work environment claim, stating only that he was "subjected to a hostile work environment" in the first sentence of his Complaint. [Doc. 1]. Davenport's Memorandum in Opposition to MWW's Motion for Summary Judgment similarly mentions this claim in only one sentence. [Doc. 22 at 1]. MWW argues that Davenport has waived this claim by failing to respond to its summary judgment motion. [Doc. 24 at 1]. However, to the extent that the Complaint in its entirety contains sufficient allegations to state a claim for an unlawful hostile work environment, and because Davenport's Memorandum in Opposition references the claim and necessarily describes the alleged hostile work environment when describing the claim for retaliation, the Court will, out of an abundance of caution, address this claim.

> licenses, and exactions of every kind, and to no
> other.

42 U.S.C.A. § 1981(a). A hostile work environment exists "when the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive work environment." Boyer-Liberto v. Fontainebleau Corp., 786 F.3d 264, 277 (2015) (internal quotations omitted) (quoting Harris v. Forklift Sys., Inc., 510 U.S.17, 21 (1993)). To establish a hostile work environment under § 1981, a plaintiff must show (1) unwelcome conduct; (2) that conduct was based on the plaintiff's race; (3) the conduct was "sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment;" and (4) the conduct is imputable to the employer. Id. In this case, MWW argues Davenport has failed to present a forecast of evidence as to the third and fourth prongs of this test. [Doc. 17-1 at 12].

The Fourth Circuit has held that "even a single incident in which [the racial epithet n*****] or one like it is directed at an employee may be 'severe enough to engender a hostile work environment.'" Savage v. Maryland, 896 F.3d 260, 277 (4th Cir. 2018) (quoting Boyer-Liberto, 786 F.3d at 280). The racial epithet directed toward Davenport is "'pure anathema to African-Americans,' as it should be to everyone." Freeman v. Dal-Tile Corp., 750

F.3d 413, 422 (4th Cir. 2014) (quoting Spriggs v. Diamond Auto Glass, 242 F.3d 179, 185 (4th Cir. 2001)). Here, while at work, a deeply inappropriate racial epithet was directed at Davenport by a fellow employee. While it can be argued that Martinez's use of the epithet was a grossly misplaced expression of camaraderie, such conduct is sufficient for a reasonable jury to find that it engenders a hostile work environment. Thus, the defendant is not entitled to summary judgment based on the evidence concerning the third prong of the hostile work environment test.

However, "the existence of unwelcome conduct, based on an employee's race or sex, that is severe or pervasive enough to create a hostile work environment, is not on its own enough to hold an employer liable." Bazemore v. Best Buy, 957 F.3d 195, 201 (4th Cir. 2020). There also must be some basis for the harassment to be attributed to the employer. Id. In determining whether the employer is liable for the harassment the status of the harasser is relevant. Boyer-Liberto, 786 F.3d at 278. In cases where the harasser is a "supervisor," the employer is liable unless the employer can establish that "(1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." Vance v. Ball State Univ., 570 U.S. 421, 424 (2013). If

12

the harasser is victim's co-worker, the employer is only liable if it was negligent in controlling the working conditions. Vance, 570 U.S. at 424.

In this case, Davenport's coworker, Martinez, made the harassing remark. Thus, to hold MWW liable, Davenport must show that MWW "knew, or should have known, about the harassment and failed to take action reasonably calculated to stop it." Bazemore, 957 F.3d at 201. "A remedial action that effectively stops the harassment will be deemed adequate as a matter of law." E.E.O.C. v. Xerces Corp., 639 F.3d 658, 670 (4th Cir. 2011) (internal quotations omitted) (quoting Knabe v. Boury Corp,, 114, F.3d 407, 411-12 n.8 (3d Cir. 2997)).

Here, after learning of the use of the racial epithet the same day it happened, MWW immediately began an investigation, issued written warnings to all involved, notified those involved that another instance of similar conduct would result in immediate termination, and moved Martinez to a shift away from Davenport. Davenport has not offered any forecast of evidence to indicate that any further use of the epithet, or any similar harassing conduct, continued after MWW took those actions. Accordingly, as the remedial actions effectively stopped the harassment, thus MWW controlled the workplace, and this is adequate as a matter of law,. Thus, Davenport's forecast fails to meet the fourth prong of the hostile-work-

environment test. Accordingly, the Court will grant summary judgment for MWW on the hostile work environment claim.

## B. Retaliation

Davenport asserts a cause of action for retaliation in violation of 42 U.S.C. § 1981. [Doc. 1 at ¶¶ 10-14]. Davenport's Complaint alleges that he was "terminated after expressing concerns about racially offensive language in the work place." [Id. at ¶ 11].

The procedural framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), establishes how courts should evaluate claims of retaliation when a plaintiff lacks direct evidence of retaliatory discrimination, as is the case here. Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 250 (4th Cir. 2015). If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to show that its "purportedly retaliatory action was in fact the result of a legitimate non-retaliatory reason." Id. Should the defendant produce such a reason, the burden shifts back to the plaintiff who has the "ultimate burden of persuading to the court that [he] has been the victim of intentional [retaliation]." Id. at 252 (second alteration in original) (internal quotations omitted) (quoting Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004)). To meet this burden, the plaintiff "must establish 'both that the [employer's] reason was

14

false and that [retaliation] was the real reason for the challenged conduct.'" Id. (alterations in original) (quoting Jiminez v. Mary Wash. Coll., 57 F.3d 369, 378 (4th Cir. 1995)). For the purposes of summary judgment, at this third stage—known as the "pretext stage"—the plaintiff need only undercut the employer's proffered explanation enough such that a rational finder of fact could conclude that the explanation was pretextual. Westmoreland v. TWC Admin. LLC, 924 F.3d 718, 727 (4th Cir. 2019).

To establish a prima facie case of retaliation, a plaintiff must show (1) that he engaged in protected activity; (2) the employer took an adverse action against him; and (3) there is a causal connection between the protected activity and the adverse action. Hoyle v. Freightliner, LLC, 650 F.3d 321, 337 (4th Cir. 2011); Ziskie v. Mineta, 547 F.3d 220, 229 (4th Cir. 2008). Complaining about racial discrimination constitutes engaging in protected activity. Holland v. Wash. Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007). "An adverse action is one that 'constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" Hoyle, 650 F.3d at 337 (quoting Ellerth, 524 U.S. at 761).

Here, MWW does not dispute that Davenport has presented a forecast of evidence as to the first two elements. Davenport complained about the use of a racial epithet, and he was subsequently terminated from his employment. However, MWW disputes that Davenport can sufficiently show a causal connection between the termination and his complaint of a racially hostile workplace. [Doc. 17-1 at 13]. Davenport argues that the temporal proximity between his complaint of the use of the racial epithet and his termination is sufficient to set forth a prima facie causal connection. [Doc. 22 at 9].

Under the McDonnell Douglas framework, the burden of establishing causation at the prima facie stage of a retaliation claim is "less onerous" than the plaintiff's later burden at the pretext stage. Foster, 787 F.3d at 251. The Fourth Circuit has held that both a month and a two-and-a-half-month gap between protected activity and an adverse employment action were "sufficiently narrow to establish the causation prong of the prima facie case solely on the basis of temporal proximity." Id. at 253. Here, Davenport complained of racial discrimination on November 9, 2018, and he was terminated on December 6, 2018. Under the "less onerous" prima facie burden, this temporal proximity of less than a month is sufficient evidence of causation to progress to the next step. Accordingly, Davenport has set forth

a prima facie case of retaliation in order to shift the burden to MWW to show that it had a legitimate, nondiscriminatory reason for terminating him.

MWW's burden at the second stage of the McDonnell Douglas framework is one of production, not persuasion. See Westmoreland, 924 F.3d at 731. Therefore, MWW need only articulate a legitimate, nonretaliatory reason for Davenport's termination. Id. Here, MWW has satisfied this burden, citing both the mistakes Davenport made on the print machines (and the waste caused by those mistakes) and his insubordination during the December 3-4 shift as causes for his termination. Thus, the burden shifts back to Davenport to show that those nonretaliatory reasons are pretextual and that retaliation was the true reason for his termination.

In an attempt to show pretext, Davenport argues that there is an issue of fact as to whether he was actually disruptive in the workplace; that his working relationship with coworkers changed after he reported the racial epithet; that he was not the only person in the department who made mistakes and certain references to wasted materials could not have resulted from mistakes he made; and that other employees violated company policy and were not terminated. [Doc. 22 at 10-13]. The Court will consider each of these arguments in turn to determine whether Davenport has offered a

forecast of evidence that could lead a rational trier of fact to determine that MWW's proffered reason for termination was pretextual.

### 1. Whether Plaintiff was Disruptive

In his Response in Opposition to MWW's Motion for Summary Judgment, Davenport argues that MWW's explanation that he was insubordinate and disruptive was pretextual because he was not, in fact, disruptive. [Doc. 22 at 10-12]. However, Davenport fails to support this argument with any forecast of evidence, stating only that "Plaintiff denied that he was disruptive in the work place" with no citation to any document or evidence in the record. [Id. at 10]. Moreover, it is uncontroverted that Davenport interrupted Andrade, the print room supervisor, during the December 3 meeting, [Id. at 114-16], and that he interrupted his team leaders, Walker and Dotson, during their conversation during the December 3-4 shift, [Id. at 119-20].

The Plaintiff cites to the affidavit of his coworker, Brandi Schuh ("Schuh"), as creating a genuine issue as to whether the Plaintiff actually acted rudely to his supervisors on those two occasions. [Doc. 22 at 6]. That affidavit, however, does not contradict in any way the evidence of the Plaintiff's insubordination. While Schuh states that she "ha[s] attended group meetings" and "do[es] not recall Troy Davenport being belligerent,

18

disrespectful or rude to other managers or other coworkers," there is no evidence, from Schuh or otherwise, that she was present for the December 3 meeting at which Davenport does not dispute that he interrupted Andrade, or for the conversations during the December 3-4 shift between Walker, Dotson, and Davenport. [Doc. 22-2: Schuh Aff. at ¶¶ 6-7]. Accordingly, Schuh's affidavit fails to create any genuine issue of fact.

### 2. Plaintiff's Relationship with Coworkers

Davenport argues that his changed relationship with coworkers supports a conclusion that MWW's purported reasons for termination are pretextual. [Doc. 22 at 10-11]. Specifically, Davenport asserts that, after the individuals involved in the Martinez Incident had been disciplined, his working relationship with coworkers changed and "[i]t appeared there was a concerted effort from his coworkers and the two new leads assigned to find fault with him and to 'document' a file on him." [Id at 12]. This, of course, is conjecture. Davenport cites to no evidence showing a change as to how his mistakes or behavioral violations were documented.

To support his assertion that coworkers behaved more coldly toward him after he reported the Martinez incident, Davenport forecast consists largely of his own subjective perceptions. Davenport testified that coworkers in a meeting were "looking at [him]" and that he told Andrade that "for some

19

reason, I feel like you—you're talking to me." Doc. 17-5: Davenport Dep. at 114-15]. Schuh stated that she "saw a distinct change in the behavior and attitude of the supervisor and the lead team members towards Mr. Davenport after he raised a complaint about the racist comment that was directed towards him. They were no longer friendly towards him and seemed to ostracize him." [Doc. 22-2: Schuh Aff. at ¶ 9]. This, however, is not evidence of why the level of friendliness declined. A general decline in friendliness from coworkers or supervisors is not at odds with a termination based on insubordination and poor work performance. Moreover, Davenport has not forecasted any evidence that his termination was connected to any such decline in friendliness. Therefore, Davenport's assertion of changing attitudes of coworkers would not lead a rational trier of fact to conclude that MWW's nonretaliatory reasons for termination were pretext.

### 3.   Mistakes Made by Others or by Other Machines

To rebut MWW's purported reason for termination of poor performance, Davenport argues that he did not cause all of the mistakes of which MWW complained because other employees were the true cause of the mistakes. [Doc. 22 at 11-12]. To support this argument, Davenport offers only speculation that other people entered errors on his machine when he was on break. Davenport presents no forecast of evidence that he saw

anyone do so. No coworker or supervisor has stated that he or she observed such conduct. Thus, without more, Davenport's assertions are mere speculations and insufficient to create a genuine issue of material fact. See Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 308 (4th Cir. 2006) ("Mere unsupported speculation is not sufficient to defeat a summary judgment motion if the undisputed evidence indicates that the other party should win as a matter of law."). Importantly, Davenport testified that at least some of the mistakes of which MWW complained were his fault, testifying that "I had [sic] made errors and mistakes." [Doc. 17-5: Davenport Dep. at 112].

Moreover, Davenport does not assert that he reported to supervisors that others were entering mistakes on his machine. The perception of the decision maker, and not the plaintiff's self-assessment, is the relevant inquiry for retaliation claims. Evans v. Techs Applications & Serv. Co., 80 F.3d 954, 960-61 (4th Cir. 1996). From Sargent's perspective, multiple mistakes were made on Davenport's machine and Sargent had no reason to attribute those mistakes to anyone other than Davenport.

However, Davenport also argues that some of the mistakes of which MWW complained could not have been made on his machine at all. In his Memorandum in Opposition to MWW's Motion for Summary Judgment,

Davenport argued that "[t]he jury could also conclude that references to wasted material and fleece could not have been Plaintiff's fault since Plaintiff's work only involved paper and not material." [Doc. 22 at 12]. While this argument is only referenced in passing, it seems to be an attempt to contrast Schuh's testimony that "[t]here was no fleece or other fabric that ran through the machine that Troy Davenport operated," [Doc. 22-2: Schuh Aff. at ¶ 4], with multiple references in the record to wasted fleece or other material, [see, e.g., Doc. 17-3: Andrade Decl. at ¶ 29 ("I explained to [Davenport] about the importance to do the job correctly at the first time to avoid any kind of waste, also I used the example that 51 fleece were trashed due to were [sic] printed doubled and I also said that we wasted 3 hours of printing time, plus the paper, the ink."); Doc. 17-2: Sargent Decl. at ¶ 49 ("I have had multiple conversations with [Mr. Davenport] about ripping in images. I always tell him what number he can put on the roll and he always goes over that number. For example one night I told him to put 100 comforters on a roll . . . I went back a little while later to check on [Mr. Davenport]. [Mr. Davenport] said that his machine had stopped working. After I looked to see why his machine had stopped working I saw that he had ripped in 540 something comforters which made the machines computer lock up and stop working. He had already run almost 100 comforters. This wasted

22

time and fabric. We had to cancel that batch and throw away the comforters. It takes a long time to rip in those images and to print that many comforters. So that was at least an hour of wasted ink and paper.")].

Schuh provides no time frame for the statement that "no fabric . . . ran through" the Plaintiff's machine. [Doc. 22-2: Schuh Aff. at ¶ 4]. Davenport himself testified that he printed on fabric, including comforters and shirts. [Doc. 22-1: Davenport Dep. at 64]. As such, the Plaintiff's argument based on Schuh's affidavit misrepresents the record.

Accordingly, Davenport's arguments do not rebut MWW's assertion that he was terminated for making mistakes and not in retaliation for engaging in protected activity.

### 4.    Other Company Policy Violations

In arguing that MWW's proffered reason for terminating him was pretextual, Davenport contends that other employees also violated company policy and were not terminated. [Doc. 22 at 11]. Specifically, Davenport argues that "Broyles came to work under the influence of alcohol" and that "there was drug use in the plant."[6] [Id.]. These arguments appear to be an attempt to show pretext through comparator evidence. A plaintiff seeking to

---

[6] Davenport testified that he personally observed the use of drugs in the plant and that he personally observed that Broyles was under the influence of alcohol at work. [Doc. 22-1: Davenport Dep. at 75-77].

show pretext through comparator evidence must "produce evidence that the plaintiff and comparator 'dealt with the same supervisor, [were] subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" <u>Haynes v. Waste Connections, Inc.</u>, 922 F.3d 219, 223-24 (4th Cir. 2019) (alterations in original) (quoting <u>Haywood v. Locke</u>, 387 F. App'x 355, 359 (4th Cir. 2010)).

Here, Davenport's comparator examples are wholly different from the conduct for which MWW terminated Davenport. Davenport has not provided any forecast of evidence to suggest that any other employee who made multiple printer mistakes, wasted materials, and was insubordinate and disruptive at work was treated differently from him. Davenport's comparator examples involve conduct that is entirely dissimilar from his own. The only commonality to which Davenport points is that the conduct would presumably violate MWW policy. These broad allegations of other violations of "company policy" are insufficient to show that others who "engaged in the same conduct" were treated differently. Thus, this comparator evidence does not tend to prove pretext. Accordingly, as Davenport has failed to rebut MWW's nonretaliatory explanation for his termination at the pretext stage,

the Court will grant summary judgment for MWW as to Davenport's claim for retaliation.

## C. Infliction of Emotional Distress

Davenport's Complaint asserts a claim for "emotional infliction of emotional distress." [Doc. 1 at ¶¶ 15-19]. Such a claim does not exist. In his Memorandum in Opposition to MWW's Motion for Summary Judgment, Davenport characterizes this claim as one for intentional infliction of emotional distress ("IIED"). [Doc. 22 at 1]. However, in setting out the facts related to this cause of action in the Complaint, Davenport states that "Defendant's actions . . . were done negligently" and "Defendant engaged in a course of action that involved a breach of its duty of care to Plaintiff," allegations that appear to relate to a claim for negligent infliction of emotional distress ("NIED"). [Doc. 1 at ¶¶ 16-17]. The Court will briefly address both claims.

### 1. Intentional Infliction of Emotional Distress

The essential elements of a claim for IIED are: (1) extreme and outrageous conduct by the defendant, (2) which is intended to and did in fact cause (3) severe emotional distress. Dickens v. Puryear, 302 N.C. 437, 452, 276 S.E.2d 325, 335. "Conduct is extreme and outrageous when it is 'so outrageous in character, and so extreme in degree, as to go beyond all

possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Smith-Price v. Charter Behavioral Health Sys., 164 N.C. App. 349, 354, 595 S.E.2d 778, 783 (2004) (quoting Briggs v. Rosenthal, 73 N.C. App. 672, 677, 327 S.E.2d 308, 311 (1985)). The threshold determination of whether the alleged conduct may be considered extreme and outrageous is a question of law for the trial judge. Id.

Here, Davenport's Complaint alleges that MWW's termination of his employment caused him emotional distress. Therefore, the question before the Court is whether terminating Davenport was extreme and outrageous beyond all possible bounds of decency. As the Court has already concluded that Davenport's forecast of evidence is insufficient to show he was terminated as retaliation for complaining of a racially hostile work environment, the question is whether terminating an employee for poor performance and insubordination constitutes outrageous conduct.[7] The

---

[7] However, even if Davenport was terminated in retaliation, such termination is not extreme and outrageous such that it meets the standard of an IIED claim. Acts that are "unjustified" do not necessarily rise to the level of being extreme and outrageous. Hogan v. Forsyth Country Club Co., 79 N.C. App. 483, 494, 340 S.E.2d 116, 123 (1986). In Hogan, the court found that, while unjustified, a supervisor refusing to grant a leave of absence for pregnancy, cursing at an employee, directing her to carry heavy objects, and terminating her when she left to go to the hospital without permission was not extreme and outrageous conduct. If Davenport's termination was retaliatory, it presents a similar situation to Hogan—while unjustified, a retaliatory termination does not rise to meet the legal standard.

Court concludes that it does not. Terminating an employee for poor performance and insubordination falls squarely within the bounds of a civilized society and is in fact a routine occurrence. Accordingly, to the extent Davenport asserted a claim for intentional infliction of emotional distress, the Court will grant summary judgment in MWW's favor.

### 2. *Negligent Infliction of Emotional Distress*

The essential elements for a claim of NIED are: (1) the defendant engaged in negligent conduct, (2) reasonably foreseeable to cause the plaintiff severe emotional distress, (3) which, in fact, caused plaintiff severe emotional distress. Sorrells v. M.Y.B. Hospitality Ventures, 334 N.C. 669, 672, 435 S.E.2d 320, 321–22 (1993). Here, Davenport has not presented any forecast of evidence of any negligent conduct on the part of MWW or any severe emotional distress on his part. Accordingly, to the extent Davenport asserted a claim for negligent infliction of emotional distress, the Court will grant summary judgment in MWW's favor.

## V.    CONCLUSION

For the reasons set forth above, **IT IS, THEREFORE, ORDERED** that MWW's Motion for Summary Judgment [Doc. 17] is **GRANTED,** and this action is **DISMISSED WITH PREJUDICE.**

A judgment consistent with this Memorandum of Decision and Order will be entered contemporaneously herewith.

The Clerk is respectfully directed to close this civil action.

**IT IS SO ORDERED.**

Signed: April 21, 2023

Martin Reidinger
Chief United States District Judge

28